UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| MICHAEL ESPINOSA, ET AL., | § § § § | |
| *Plaintiffs*, | § § | |
| *v.* | § § | Civil Action No.  SA-15-CV-879-XR |
| STEVENS TANKER DIVISION, LLC, | § § § § | |
| *Defendant.* | § § | |

**ORDER**

On this date, the Court considered the status of the above captioned case. There are currently three pending motions—Plaintiff's Motion to Decertify the Conditional Class (Docket no. 91), Defendant's Motion for Attorney Fees (Docket no. 94), and Plaintiffs' Motion for Reconsideration (Docket no. 98). The second and third motions derive from the same underlying dispute and will be discussed together.

After careful consideration, the Court DENIES Plaintiff's Motion to Decertify (Docket no. 91). The Court GRANTS IN PART Defendant's Motion for Attorney Fees (Docket no. 94) and GRANTS IN PART AND DENIES IN PART Plaintiffs' Motion for Reconsideration (Docket no. 98).

**BACKGROUND**

**I.    Introduction**

Plaintiff Michael Espinosa filed his Complaint on October 12, 2015, alleging violations of the Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq*. Docket no. 1 at 1. Espinosa was employed as a dispatcher for Defendant Stevens Tanker Division, LLC ("Stevens"). He claims his duties included answering phone calls, informing drivers of dispatch sites, recording information from drivers who were present at job sites, and other office tasks. Docket no. 20 at 2.

1

He alleges that he worked a schedule of "one week on and one week off" and that during the "on" weeks he regularly worked approximately 84 hours a week. Docket no. 1 at 3. He claims he was improperly classified as an exempt employee and did not receive overtime pay for the hours he worked in excess of forty per week. *Id.* The Complaint states that Espinosa brings his claim "on behalf of all similarly situated present and former employees of Defendant who were either misclassified and/or not properly paid for all overtime due and/or not paid for all hours worked." *Id.*

## II.    Conditional Certification

On August 5, 2016, this Court entered an Order granting in part and denying in part Plaintiff's Motion for Conditional Class Certification. Docket no. 40. The Court granted initial conditional certification of a class composed of all past or present salaried dispatchers who worked for Defendant any time since October 12, 2012, at any of Defendant's locations, who were not paid overtime compensation. The Court also ordered Stevens to produce a list—in electronic format—of the name, last known physical address, last known email address, and last four digits of social security number of all current and former employees in the class as granted above within fourteen days of the Order. Upon receipt of the list, Plaintiff was ordered to send a notice to potential class members with a date-specific deadline for opting-in that is sixty days from the date of the mailing of the notices. Counsel for both parties were ordered to confer regarding the content of the notice and notify the Court in the case of any disputes.

Much of this order addresses Plaintiffs' opposed Motion to Decertify the Conditional Class, in which Plaintiffs seek decertification of their own class because "in reviewing the potential claims of numerous opt-ins, it is apparent that their claims are not the same or similar and/or their work situations varied greatly from [Espinosa]." Docket no. 91 at 2.

### III.    The Sanctions Order

On January 20, 2017, Stevens filed a Motion to Void Opt-in Consents ("motion to void"). Docket no. 69. The thrust of the motion was that Class Counsel sent out notices to potential opt-in plaintiffs that deviated from the agreed upon notice in terms of substance, form, and frequency. *See generally id*. At a January 25 hearing, the Court heard limited argument on this motion. The Court advised the parties that it was taking the matter under consideration and that if indeed Class Counsel engaged in sanctionable conduct, the innocent opt-ins would not be punished by having their consent forms stricken. To this extent, the Court denied the motion to void. Class Counsel did not file a response to this motion either before the hearing or after the hearing.

On February 7, the Court issued an order denying Stevens' Motion to Void but sanctioning class counsel. Docket no. 74. The sanctions order summarizes the conditional certification order. *Id*. at 3 (discussing Docket no. 40). As the Court stated in the sanctions order, the certification order made clear that the Court contemplated that only one notice be sent. *Id*.; *see also* Docket no. 40 at 8. With this background, the Court stated:

> Despite the Court's Order and the parties' agreement, Class counsel issued four notices. Further, as indicated above, Class Counsel deviated from the agreed upon language of the Notice and included statements that would mislead the recipient to infer that the Court was mandating that they join the lawsuit, or that the Defendant was providing incorrect addresses in an effort to dissuade them from joining the lawsuit. Just as importantly Class counsel violated his duty as an officer of the Court to be candid and cooperative when possible. The Court needs parties to engage in cooperative behavior when possible to achieve a "just, speedy, and inexpensive determination" of the case. *See* FED. R. CIV. P. 1.

> This Court does not sanction Class counsel for violation of Rule 1. Nor does the Court grant Stevens' request to strike the opt-in members. This remedy would serve only to sanction innocent individuals who were not aware of the parties' agreed upon notice. The Court, however, does sanction Class counsel under the Court's inherent authority for acting in bad faith. "It is well-settled that a federal court, acting under its inherent authority, may impose sanctions against

litigants or lawyers appearing before the court so long as the court makes a specific finding that they engaged in bad faith conduct." *In re Yorkshire, LLC*, 540 F.3d 328, 332 (5th Cir. 2008).

Class counsel was aware of the Court's Order authorizing one notice, never sought clarification of the Order, reached an agreement with counsel for Defendant as to the form of the Notice, and then proceeded to issue four notices that deviated from the agreed upon form. The last two notices proceeded to give the reader the impression that the Court had an opinion as to the merits of the case. The Court advised Class counsel it was taking under consideration what, if any, sanctions should be imposed, offered Class counsel an opportunity to explain his conduct, and no satisfactory explanations were given.

Docket no. 74 at 3–4 (footnotes omitted). On this reasoning, the Court sanctioned Class Counsel as follows: "It is ORDERED that should Class counsel be successful in recovering a settlement or judgment in this case, neither he nor his law firm may recover any attorney's fees for the prosecution of any of the opt-in plaintiffs who signed their opt-in forms after receiving the second, third or fourth notice. It is further ORDERED that Class Counsel pay the reasonable attorney's fees incurred by Defendant for their filing of its Motion to Void Opt-In Consents (docket no. 69)." *Id*. at 4.

## DISCUSSION

### I.    Plaintiffs' Motion to Decertify

The Court's previous certification order summarized the applicable law as follows:

29 U.S.C. § 216 [of the FLSA] permits an employee to bring an action against an employer "[on] behalf of himself . . . and other employees similarly situated." Unlike a Rule 23 class action, in which plaintiffs "opt out" of the class, a § 216 plaintiff must "opt in" to become part of the class. *See* FED. R. CIV. P. 23; *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1212 (5th Cir. 1995). Accordingly, the method adopted by this Court[1] for determining whether to certify a collective action under § 216(b)—the *Lusardi* two-tiered approach—involves conditional certification, allowing the plaintiff to notify potential members of the action, followed by a factual determination at a second stage as to whether the putative

---

[1] The Fifth Circuit has specifically permitted district courts to apply the *Lusardi* approach at the district court's discretion, but has not formally adopted the *Lusardi* approach itself. *Mooney*, 54 F.3d at 1214. This Court has previously applied the *Lusardi* approach. *See, e.g., Barrera v. MTC, Inc.*, SA-10-CV-665-XR, 2011 WL 809315 (W.D. Tex. Mar. 1, 2011).

class members are similarly situated. *Lusardi v. Xerox Corp.*, 118 F.R.D. 351 (D. N.J. 1987); *Mooney*, 54 F.3d at 1213–14.

In the first stage, called the notice stage, the district court must make an initial determination whether notice of the action should be sent to potential class members. *Lusardi v. Xerox Corp.*, 118 F.R.D. at 351; *Mooney*, 54 F.3d at 1213. This determination is based solely on the pleadings and affidavits. The pleadings and affidavits must make a preliminary factual showing that a similarly situated group of potential plaintiffs exists. *Trezvant v. Fid. Employer Servs. Corp.*, 434 F. Supp. 2d 40, 43 (D. Mass. 2006). The standard is a lenient one typically resulting in conditional certification of a representative class to whom notice is sent and whose members receive an opportunity to opt in. "The decision to create an opt-in class under § 216(b), like the decision on class certification under Rule 23, remains soundly within the discretion of the district court." *Hipp v. Liberty Nat. Life Ins. Co.*, 252 F.3d 1208, 1219 (11th Cir. 2001); *see* U.S.C. § 216(b); *Mooney*, 54 F.3d at 1213–14.

Once conditional certification is granted, the case proceeds through discovery as a representative action. *Mooney*, 54 F.3d at 1214. Upon completion of discovery, the defendant may file a motion for decertification. *Id*. At this second stage of the analysis, the district court should make a factual determination as to whether the putative class members are similarly situated. *Id*. If so, then the representative action may proceed; if not, then the class should be decertified, the opt-in plaintiffs dismissed, and the class representatives should be allowed to proceed on their individual claims. *See Johnson v. TGF Precision Haircutters, Inc.*, 319 F.Supp.2d 753, 754–55 (S.D. Tex. 2004). . . .

A finding that employees are similarly situated does not require that the employees work in identical positions. *Mateos v. Select Energy Services, LLC*, 977 F. Supp. 2d 640, 643–45 (W.D. Tex. 2013) (citing *Walker v. Honghua Am., LLC*, 870 F.Supp.2d 462, 468 (S.D. Tex. 2012)). However, to satisfy the "similarly situated" standard, a plaintiff must provide "substantial allegations that the putative class members were together the victims of a single decision, policy, or plan infected by discrimination." *Mooney*, 54 F.3d at 1214 n. 8 (quoting *Sperling v. Hoffmann–La Roche, Inc.*, 118 F.R.D. 392, 407 (D. N.J. 1988)). Furthermore, the class member representatives "must be similarly situated in terms of job requirements and similarly situated in terms of payment provisions." *Ryan v. Staff Care, Inc.*, 497 F.Supp.2d 820, 824–25 (N.D. Tex. 2007). In other words, while "[s]light differences in job duties or functions do not run afoul of the similarly situated requirement," *Tolentino v. C & J Spec–Rent Servs., Inc.*, 716 F.Supp.2d 642, 651 (S.D. Tex. 2010), "[i]f the job duties among putative class members vary significantly, then class certification should be denied." *Villarreal v. St. Luke's Episcopal Hosp.*, 751 F. Supp. 2d 902, 918 (S.D. Tex. 2010).

Docket no. 40 at 3–4 (footnote original, some alterations added).

Having arrived at the second stage of the *Lusardi* approach, the Court must now make the factual determination of whether the opt-in plaintiffs are similarly situated, which requires the Court to examine three factors: "(1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; and (3) fairness and procedural considerations." *Clark v. Centene Co. of Tex., L.P.*, 44 F. Supp. 3d 674, 688 (W.D. Tex. 2014); *Roussell v. Brinker Intern., Inc.*, 441 F. App'x. 222, 226 (5th Cir. 2011); *Mooney*, 54 F.3d at 1214. District courts in the Fifth Circuit have repeatedly stated that plaintiffs need only be *similarly* situated, not *identically* situated. *See, e.g., Falcon v. Starbucks Corp.*, 580 F. Supp. 2d 528, 534 (S.D. Tex. 2008) ("Courts have repeatedly stressed that Plaintiffs must only be similarly—not identically—situated to proceed collectively.").

Before turning to the three-factor "similarly situated" inquiry, the Court briefly notes the procedural oddity of Plaintiffs' motion. The case law speaks unambiguously in terms of a *defendant's* ability to seek decertification at the second stage of the *Lusardi* analysis. *See, e.g., Valdez v. Calton Management LLC*, No. SA-13-CA-865-FB, 2015 WL 12552024, at *2 (W.D. Tex. Sept. 15, 2015) ("The [conditional certification] motion is granted subject to the Court revisiting the issue of certification should the defendants file a motion to decertify the class once discovery is complete. *McPherson v. LEAM Drilling Sys., LLC*, 2015 WL 1470554 at *2 (S.D. Tex. Mar. 30, 2015). Even after a court has denied a motion to decertify, the issue may be revisited as the case progresses. *Id*."). Yet in this case, it is the plaintiffs—not the defendant—who have moved to decertify the conditional class, and the defendant opposes this request. Plaintiffs identify no cases in which a conditionally certified class moves to decertify itself. Stevens identifies two such cases, but both present issues distinct from the one here—namely, a

contested question of full decertification at the opt-ins' own request.[2] As a result of this strange posture, the parties' positions from the conditional certification stage have effectively flipped—previously, Plaintiffs argued *in favor of* certification and Stevens argued *against it*.[3] With this odd procedural posture in mind, the Court assumes that plaintiffs are able to request decertification of their own class and that the legal standard governing a defendant's motion to decertify also applies when a plaintiff brings the same motion.

### a. There are no disparate factual and employment settings of the individual plaintiffs that warrant decertification.

The majority of Plaintiffs' motion to decertify is a recitation of details that Plaintiffs argue show disparate factual and employment settings of the individual plaintiffs. These facts are also relevant to the second factor, which involves Stevens' defense of the administrative exemption. On both points, Plaintiffs assert that: (1) the opt-ins performed different job duties; (2) "[d]efendant had two separate district offices and each office worked under different management"; (3) some dispatchers worked under a dispatch supervisor while others did not; and (4) some dispatchers were actually titled "senior dispatchers" while others were not. Docket no. 91 at 4–6. The Court will address the evidence to support each of these contentions in turn.

---

[2] In *Parler v. KFC Corp.*, CIV.05-2198(PJS/JJG), 2007 WL 1621464, at *1, *3 (D. Minn. Jan. 22, 2007), *report and recommendation adopted in part, rejected in part*, 05-CV-2198(PJS/JJG), 2007 WL 1621458 (D. Minn. June 4, 2007), the court granted plaintiffs' motion to decertify where the plaintiffs conceded that they were not similarly situated and the defendant did not argue otherwise. In *Medina v. Happy's Pizza Franchise, LLC*, 10 C 3148, 2012 WL 1094353, at *4–5 (N.D. Ill. Apr. 2, 2012), plaintiffs moved to partially decertify, subclass, and transfer portions of the class, but the dispute there did not center around whether the opt-ins were similarly situated, but instead around the procedural mechanics of subclassing.

[3] As a result of their changing positions, both parties come across as somewhat disingenuous in their present arguments. Nevertheless, the two-step *Lusardi* invites the parties to re-visit the propriety of class certification after discovery. As a result, the Court will not hold either parties original *arguments* from the first stage against that party; the discovery process may well have changed the parties' own view of the facts. On the other hand, the Court will consider the *evidence* that was presented at the initial certification stage because, although the parties view of the circumstances may have changed as more facts were uncovered, the facts themselves cannot have changed.

### i.   The opt-in dispatchers' job duties

Plaintiffs rely on the affidavit of Allen Tinsley, a management employee at Stevens, for a detailed description of the job duties of the named plaintiff, Espinosa. Docket no. 91 at 4 (citing Docket no. 91-1 at 5–13). Based on this affidavit, Plaintiffs argue that "[e]ach opt in [sic] would each have a different set of facts regarding these alleged job duties," which precludes the opt-ins from being similarly situated.

Nowhere in his affidavit does Tinsley indicate that Espinosa's job duties differed from those of the other opt-ins. Plaintiffs merely hypothesize that a detailed description of job duties, like Tinsley's explanation of Espinosa's duties, would be required for each opt-in. Yet the evidence is to the contrary, showing that the job duties of the opt-ins did *not* differ. In support of their initial motion to conditionally certify a class, Plaintiffs provided declarations from Espinosa and two other opt-ins, Alice Fay Hart and Kiya McChristian. Espinosa stated that "[his] job duties were to answer calls and inform the drivers of the work locations" and that "[d]uring [his] employment with Stevens Tanker Division, LLC, [he] worked with other persons who held the same position as [him], a dispatcher, who performed the same duties as [he] did." Docket no. 23 at 8. Hart similarly stated that "[her] job duties were to answer calls, take and record information from the drivers and inform the drivers of the dispatch locations" and that "[she] worked with other persons who held the same position as [her], a dispatcher, who performed the same duties as [she] did." *Id.* at 11–12. McChristian provided nearly identical statements: "My primary job duties were to answer client calls, inform the drivers of the work locations, answer and respond to calls from drivers . . . I worked with other persons who held the same position as me, a dispatcher, who performed the same duties as I did." *Id.* at 15. All of these descriptions of the dispatchers' job duties are consistent with (albeit far less detailed than) the description from

Tinsely's affidavit. Plaintiffs have not presented any evidence to show that the job duties of dispatchers differed, and the evidence provided shows that an inquiry into the job duties of any one dispatcher would be illustrative of the job duties of other dispatchers.

### ii. Stevens' two offices

In his deposition, Tinsley indicated that Stevens had one "location" or "office" in Stockdale and one in Cresson–Jacksborough. Docket no. 91-4 at 5. The parties disagree over what these locations are called. Plaintiffs' motion to decertify characterizes them as "district offices," "districts," and "offices" while Stevens characterizes them as "locations." None of the deponents, declarants, or documents cited by Plaintiffs ever use the phrase "district office" or "district." Instead, the evidence consistently refers to "locations" or "offices." *E.g.*, *id*.

Whatever the proper terminology, the parties' semantic dispute is irrelevant. Plaintiffs provide no evidence to show that the existence of different locations, offices, "districts," or "district offices" has any meaningful effect on whether Stevens' dispatchers are similarly situated. In fact, the three declarations (in which all declarants recite identical job duties) show that dispatchers in Stockdale (such as Espinosa) had the same duties as dispatchers in Cresson–Jacksborough (such as Hart and McChristian). Docket no. 23 at 8 (Espinosa declaration); Docket no. 23 at 11 (Hart declaration); Docket no. 23 at 15 (McChristian declaration). As such, this fact does not favor decertification.

### iii. The presence of dispatch supervisors

According to Plaintiffs, some of Stevens' dispatchers worked without any supervision while others worked under the oversight of a dispatch supervisor. Plaintiffs argue that the presence of dispatch supervisors for some dispatchers but not others shows that the opt-ins are

not similarly situated. In addition, Plaintiffs point out that Stevens stopped employing dispatch supervisors entirely by May 2015.

> Tinsley described the nature and role of Stevens' dispatch supervisors at his deposition:

> Our supervisors are a bit different than what most people call supervisors . . . They go back from the previous day, and they check and see what we could do to improve utilization or better fit the needs of our customer. So, they're more looking back at the back and giving suggestions to the dispatch on how we could improve our profitability for Stevens Tanker . . . The dispatch supervisors looked at data from the previous day and went over that data, and if there were any inadequacies, they got with the dispatcher. *They did not directly supervise dispatch.* They would—the dispatch supervisor would give them—I'm trying to find the right word. They would give them their input on how to improve what they were doing, *but they did not directly supervise them, as far as make their decisions.*

Docket no. 91-4 at 4 (emphasis added). In his affidavit, Tinsley provided a similar description: "Supervisors reviewed the dispatcher's decisions the following day and made suggestions to the dispatcher as to the dispatcher's utilization of drivers and equipment." Docket no. 91-1 at 6. According to Tinsley, dispatch supervisors did not work all of the time. *Id.* at 4. As a result, even those dispatchers who worked under a supervisor did not do so at all times—for two to four hours of a dispatcher's 12-hour shift, no dispatch supervisor was present, and dispatch supervisors were never present on weekends. *Id.* The supervisor position was eliminated entirely in May 2015, meaning that all dispatchers worked unsupervised all of the time. *Id.*

> At his deposition, Espinosa, who worked under a dispatch supervisor, briefly spoke about his relationship with his supervisor:

> [Stevens' Counsel]: What *other factors* might you rely on in making decisions about which driver to assign to a particular well site?

> [Espinosa]: Whatever instructions our dispatch manager had for us that day. . . .

> [Stevens' Counsel]: The — Were there *any other systems* that you recall relying on in carrying out your job responsibilities of, among other things, not letting tanks overflow?

[Espinosa]: Whatever instructions we got from our dispatch manager.

Docket no. 91-3 at 7, 8 (emphasis added). At various other points in his deposition, Espinosa referenced his interactions with his dispatch supervisor, indicating that he brought certain questions to his supervisor[4] and his supervisors brought certain information to him.[5]

Espinosa's deposition also contains an exchange with Stevens' counsel in which Stevens' counsel asks "if there are driver — dispatchers who make decisions about which drivers to assign to which well sites without talking to their supervisor, and if there are dispatchers — same dispatchers who made — routinely made assignments about disposal sites based on their own knowledge and discretion, that would be different from your experience, wouldn't it?" Docket no. 91-3 at 10–11. Espinosa replied "Yes," but then stated that he was *not* familiar with any dispatchers that ever "did such a thing" at Stevens. *Id*. at 11. Stevens' counsel rephrased the question by asking whether there were people at Stevens "who are making decisions on their own about which well sites and which disposal sites." *Id*. Over a slew of objections, Espinosa testified that "I — I don't — wasn't aware of any other dispatchers assigned stuff like that." *Id*.

The role of dispatch supervisors in advising some opt-ins but not others is immaterial to the similarly situated inquiry because their presence does not appear to have change the opt-ins' job duties. Emails of Louis Willis, an opt-in dispatcher who *did not* work under a dispatch supervisor, are remarkably similar in tone and content to emails of Espinosa, an opt-in who *did* work under a dispatch supervisor. *Compare* Docket no. 91-2 (Willis emails) *with* Docket no. 99 at 16–19 (Espinosa emails). For example, Willis writes in one email "All, We can take a limited

---

[4] *E.g.*, Docket no. 104-3 at 4 ("I would go to the dispatch manager and see if I could put [drivers] other places or if they were needed at other jobs.").

[5] *E.g.*, Docket no. 104-3 at 5 ("Our supervisors would make us aware of [flow rates of a particular well at a particular time] . . . They would tell us. . . . At the direction of the dispatch manager would instruct us, 'Hey. Keep drivers on that well [if it is a high flow well].'")

11

amount of service work this morning. We have a few drivers coming in late due to their 10hr breaks. Please call dispatch before committing to anything so we can advise." Docket no. 91-2 at 3. Meanwhile, an Espinosa email reads "To all we are already booked for Saturday (8/9/14), so do not take any service work for today." Docket no. 99 at 19. To the extent that Espinosa interacted with and sought direction from his dispatch supervisor, his deposition testimony reveals that this was only one of the sources Espinosa consulted in his decision-making (though Plaintiffs have not provided the full deposition transcripts to identify the other sources upon which he relied). And, as Tinsley describes, the role of a dispatch supervisor was not to impinge on or limit dispatchers' discretion, but rather to relay information about past performance. Because there is no evidence to show that the presence of dispatch supervisors altered the job duties of any opt-ins, decertification is not warranted based on this fact.

### iv.   The "senior dispatcher" title

Plaintiffs argue that some opt-ins were merely dispatchers while others were "senior dispatchers" or "senior night dispatchers." In support of this contention, Plaintiffs cite two pieces of evidence. They first cite excerpts from Espinosa's deposition in which Espinosa discusses his "dispatch manager." Docket no. 94-3 at 7–8. This evidence has already been discussed under the umbrella of dispatch supervisors and adds nothing to the discussion of a "senior dispatcher" position because it never mentions such a position. Plaintiffs next cite emails sent from opt-in plaintiff Willis, which contain the title "Senior Night Dispatch" in Willis' email signature. Docket no. 94-2 at 2–3; Docket no. 104-1 at 2–5. Plaintiffs read Willis' emails as showing that "Willis, as 'Senior Night Dispatch', [sic] issued orders and instructions to other dispatchers and communicated with [Stevens' management] as Senior Night Dispatch." Docket no. 104 at 8–9.

Assuming that Plaintiffs' reading of Willis' emails is correct,[6] Plaintiffs overlook a portion of Willis' deposition that squarely addresses his "Senior Night Dispatch" email signature. At his deposition, Willis stated "my title was 'dispatch,' but I don't remember who was working at this time, so I may have been senior time-wise and that's why I put [Senior Night Dispatch] on there." Docket no. 99 at 11. When asked whether he put "Senior Night Dispatch" on his signature or it was an official title given to him by Stevens, Willis responded "I believe I put [Senior Night Dispatch] on [my email signature]." *Id*. Willis stated that it was something he "self-titled" himself as opposed to something that Stevens gave him as a title. *Id*. at 11–12. When asked whether he had any different authority than another dispatcher, Willis responded "No." *Id*. at 12. In light of Willis' deposition testimony, the "senior night dispatch" title does not show that the plaintiffs are dissimilarly situated because such a position does not exist.[7]

### b. Stevens' main defense—the administrative exemption—is equally applicable to all of the opt-ins because of the similarities in their job duties.

Plaintiffs argue that determining whether the administrative exemption applies "is a very fact specific [sic] as to the duties and supervision of *each individual* dispatcher" Docket no. 91 at 3 (emphasis original). Plaintiffs argue that a detailed determination of each individual opt-ins' job duties would be required in order to determine whether that opt-in is subject to the administrative exemption.

---

[6] Plaintiffs strain to characterize Willis' emails as "issu[ing] orders and instructions." *See, e.g.*, Docket no. 104-1 at 2 ("Jayd called needing trks for Willis 2H well blow out. Ashleigh and I are working on getting her trucks to go to this job. We have four on the way back with brine and we can work in somehow either to cover other sites or to head there directly. We are evaluating our water levels to see what resources we can allocate to this. Will update accordingly.").

[7] To rebut Willis' deposition testimony, Plaintiffs argue that "Willis' explanation in 2016, three years [after he sent the emails], contradicts the defendant's own written records created in 2013." Docket no. 104 at 9. This is not true. The "written records" to which Plaintiffs refer are *Willis' own emails*, which he simply explained at his deposition. There is no other evidence in the record of the "senior dispatch" title.

For reasons already discussed, this is not true. The named plaintiff and two opt-ins provided declarations stating that they had the same job duties and that other dispatchers had the same duties as well. To the extent that Tinsley's affidavit goes into far greater detail than the declarations regarding these duties, the affidavit is fully consistent with the declarations, and there is no reason why such detail would be needed from each opt-in when each opt-in had the same job duties. Furthermore, dispatch supervisors did not materially alter the opt-ins' job duties, making their presence irrelevant for purposes of the administrative exemption. Similarly, Stevens' different locations did not alter the opt-ins' job duties, nor did the "Senior Night Dispatch" title because such a title did not actually exist. Accordingly, the applicability of the administrative exemption can be determined on a classwide basis, as the relevant facts pertaining to job duties appear to be the same across the board.

### c. Fairness and procedural considerations do not favor decertification.

Finally, the Court notes that, given the procedural development of this case, fairness cuts against Plaintiffs' motion to decertify. This case has been pending for over a year and a half. Discovery closes in mere days and dispositive motions are due in just over a month. The delayed progression of this case has been at Plaintiffs' insistence, as it was Plaintiffs who moved to continue the original March 1 discovery deadline and who have since sought even further extension of the discovery deadline. And importantly, the Court recognizes that Stevens previously filed a motion for summary judgment, but withdrew the motion at the Court's request given the still-pending discovery deadline. Docket no. 66.

In addition, the Court is skeptical of Class Counsel's motive for seeking to decertify his own class. As mentioned, the Court previously sanctioned Class Counsel under its inherent authority for his conduct in sending extra and altered notices to potential opt-ins. *See* Docket no.

74. Part of this sanction stated that "should Class counsel be successful in recovering a settlement or judgment in this case, neither he nor his law firm may recover any attorney's fees for the prosecution of any of the opt-in plaintiffs who signed their opt-in forms after receiving the second, third or fourth notice." *Id*. at 4.

As the parties' briefing on this issue indicates, at the decertification stage, "[i]f the claimants are not similarly situated, the district court decertifies the class, and the opt-in plaintiffs are dismissed without prejudice." *Mooney*, 54 F.3d at 1214. Notwithstanding that the dismissed opt-ins might be able to intervene as individual parties in this action,[8] these opt-ins would be able to bring a subsequent action of their own.[9] If this course of action were to play out, Class Counsel would have successfully flouted the Court's sanctions order by bringing new actions and recovering attorney's fees there.

To summarize, on balance of the relevant factors, the Court finds that Plaintiffs are similarly situated. Particularly important to this determination is the sheer lack of evidence to show meaningful differences in job duties among the opt-ins, along with the evidence that shows that the opt-ins all worked as dispatchers in a fundamentally similar capacity. Accordingly, Plaintiffs' motion to decertify is denied.

## II.   Sanctions and Attorney's Fees

Pursuant to the Court's February 7 sanctions order, Stevens filed a motion for attorney's fees to recover the reasonable attorney's fees incurred in filing its Motion to Void Opt-In Consents. Docket no. 94. The motion requests a total recovery of $40,627.50 in attorney's fees

---

[8] *See Fox v. Tyson Foods, Inc.*, 519 F.3d 1298, 1303 (11th Cir. 2008).

[9] This possibility is particularly strong because the limitations period for these opt-ins would be tolled starting from when they filed their opt-in consent forms in this action. *Orduna v. Champion Drywall, Inc.*, 2:12-CV-1144-LDG-VCF, 2013 WL 1249586, at *1 (D. Nev. Mar. 26, 2013).

and $1,026.74 in expenses within 15 days of an order granting the motion. *Id.* at 2. Attached to this motion are two affidavits in support of these amounts.

Class Counsel responded to Stevens' Motion for Attorney's Fees on April 4. Docket no. 98. This filing includes a response to Stevens' motion, which disputes the reasonableness of the time spent preparing the motion to void. Class Counsel's response also includes a motion to reconsider the sanctions order, which argues that sanctions are inappropriate entirely or alternatively that no decision on an award of fees should be made until after a final judgment in this case.

### a. Plaintiffs' Motion to Reconsider is denied in part and is granted to the extent that it asks for an award of fees be held in abatement.

Before determining the amount of fees to which Stevens is entitled, the Court must first confirm that Stevens is entitled to fees at all in the face of Plaintiffs' motion to reconsider the sanctions order. Class Counsel makes a variety of arguments in an attempt to avoid sanctions altogether, but these arguments are without merit. As a result, the motion is denied to the extent that it asks the Court to reconsider its initial sanctions decision.

First, Class Counsel argues that he never had a chance to respond to the motion to void because he was unprepared to argue the motion at the January 25 hearing (which was set before the motion was filed). But the Court did not issue any sanctions at the January 25 hearing and explicitly said it was taking the matter under advisement. Despite having time *after* the hearing to file a timely response under the Local Rules, Class Counsel did not do so.

Class Counsel then attacks the facts as alleged by Stevens in the underlying motion to void. He argues that the number of notices sent is not sanctionable, and the form and content of the notices does not deviate from what was agreed upon. Class Counsel counsel admits to sending three notices (on August 22, September 2, and October 14), which in itself violates the

16

Court's order that one notice be sent. Docket no. 98 at 3. Regarding any notices beyond three, Stevens presented a notice sent on October 18, Docket no. 69-1 at 54, and Class Counsel affirmatively stated at a February 27 hearing that he sent a notice on October 5, even after being reminded that he would be liable for sanctions based on his representations to the Court.[10] Docket no. 86 at 20–24.

Class Counsel offers two explanations for why so many notices were sent. First, he says that Tinsley had surreptitious conversations with potential opt-ins, but there is no evidence to support this assertion and even if there were, it would not excuse Class Counsel's own wrongdoing. Docket no. 98 at 3. Second, he explains that

> Plaintiffs' counsel paralegal [sic] was contacted by potential claimants and resent the information and letter because it was requested by these potential claimants that the information be resent; this was the reason that there were other letters; it may have been Defendant invited these requests in order to make these arguments regarding the motion to void. Plaintiffs' counsel should be allowed to conduct discovery from Defendant on how it obtained these letters allegedly sent by Plaintiffs' counsel.

*Id.* at 3–4. Again, there is no evidence in the record to suggest that this was the case. Neither class counsel nor his paralegal provided affidavits to this effect. Further, Class Counsel has not submitted the communications that allegedly invited these extra notices (either between opt-ins and Class Counsel's paralegal or between Stevens and potential opt-ins).

Regarding the form of the notices, Class Counsel never addresses the cover letters that were included with the notices, nor does he address the "Sign Here" stickers that were affixed to the opt-in forms. *See generally* Docket no. 98. In terms of content, he argues that "[e]ach letter had attached the Court approved notice attached [sic]; there were no revisions to the notice nor was there any misrepresentation or misleading information provided." *Id.* at 3. Whether the

---

[10] At that hearing, Class Counsel handed a copy of the October 5 notice to Stevens' attorney. Docket no. 86 at 21.

content was misleading is discussed below, and Class Counsel's assertion that no revisions were made is demonstrably false. As stated, Class Counsel ignores the cover letters that were sent along with the agreed-upon notice. Even if the inclusion of these cover letters does not constitute a change to the content of the notices, the language of the notices does in fact vary from the agreed upon language—for example, the October 14 notice (which Class Counsel admits to sending) has a statement in bold-face type at the bottom reading "THIS IS A COURT-ORDERED NOTICE, NOT AN ADVERTISEMENT FROM A LAWYER," Docket no. 69-1 at 53, while the agreed language reads "THIS IS A COURT-APPROVED NOTICE, BY THE JUDGE ASSIGNED TO THIS CASE AND THE PARTIES' LAWYERS. THIS APPROVAL IS NOT A COMMENT ON THE VALIDITY OF THE CLAIMS OR DEFENSES IN THIS ACTION," Docket no. 69-1 at 19. The same October 14 notice includes numerous other deviations, including, for example, the omission of the agreed phrase "You are not required to join this lawsuit. It is entirely your decision." *Compare* Docket no. 69-1 at 18 (agreed notice) *with* Docket no. 69-1 at 53 (October 14 notice).

Moving beyond the facts surrounding the notices, Class Counsel argues that in general, courts have not precluded non-misleading communications with potential opt-ins. Docket no. 98 at 4–7 (collecting cases dealing with lawyer advertising, websites, and communications with potential opt-ins). This argument misreads the Court's sanctions order. Class counsel was not sanctioned for the simple fact that he communicated with potential opt-ins. He was sanctioned under the Court's inherent authority because he acted with bad faith in the manner of his communications with potential opt-ins. He acted in bad faith by sending multiple notices, even though the Court's certification and notice order contemplated only one notice, and by deviating from the agreements that he reached with opposing counsel regarding the notice. Furthermore,

even assuming that deviating from a court-ordered agreement is not itself sanctionable, the previous sanctions order explained why the deviations were in fact misleading:

> Defendant asserts that class counsel engaged in the following acts: . . . (2) Class counsel improperly sent a non-agreed upon "reminder notice" to members of the class that included a misleading heading that stated: COURT DEADLINE TO RESPOND and further stated they had "not received a response … although others have decided to opt in to the class." . . . (3) Class counsel sent a third notice to members of the Class claiming that Defendant "may have provided an incorrect address for you." This Notice (as well as the previous Notice) also changed the agreed upon introduction. The agreed upon introduction stated:  "This is a Court-approved notice by the Judge assigned to this case and the Parties' Lawyers.  This approval is not a comment on the validity of the Claims or Defenses in this action." The Notice sent stated that this "is a court-ordered notice, not an advertisement from a lawyer"; and (4) Class Counsel sent a fourth notice with the same defects in mid-October, 2016. . . .

> [A]s indicated above, Class Counsel deviated from the agreed upon language of the Notice and included statements that would mislead the recipient to infer that the Court was mandating that they join the lawsuit, or that the Defendant was providing incorrect addresses in an effort to dissuade them from joining the lawsuit. Just as importantly Class counsel violated his duty as an officer of the Court to be candid and cooperative when possible.

Docket no. 40 at 2–4.

Finally, Class Counsel requests that the Court hold its ruling on attorney's fees under advisement until a final resolution of this lawsuit because Class Counsel operates a small law office and his co-counsel is a solo practitioner such that a large award of fees during the pendency of the case would prejudice their ability to continue prosecuting the opt-ins' claims. This aspect of Class Counsel's motion is granted in part. In order to protect the opt-in plaintiffs, the Court is hesitant to make a large sanction payable during the pendency of this litigation. As a result, the award of fees to Stevens in preparing its motion to void, which is discussed in detail below, will be paid by Class Counsel 15 days after a final resolution of this case.

### b.  Stevens' Motion for Attorney's Fees is granted in part.

To support its request for over $40,000 in attorney's fees in preparing its motion to void, Stevens produces two affidavits. The first is from Stephen Key, outside counsel for Stevens in this case. Key's affidavit includes billing statements sent to Stevens for his work and the work of his co-counsel, John Freeman. At rates between $300 and $375 per hour, Key and Freeman billed approximately 80 hours relating to the Motion to Void. *See id.* at 8–25. In addition, Key's affidavit states that they spent an additional $2,100 worth of billable time on the motion, but did not bill this amount to Stevens. *Id.* at 6. Key's affidavit and billing statements also mention other costs, such as travel fees for a hearing and legal research costs. *Id.* at 8–25. The second affidavit is from Bruce Dean, General Counsel for Stevens, who includes a timesheet recounting the amounts of time that he spent on the motion. *Id.* at 41. Dean worked for 51.8 hours on the motion, which, when valued at his $300 billing rate, is worth $15,540.00.[11]

The computation of reasonable attorneys' fees involves a three step process: (1) determine the nature and extent of the services provided by Plaintiff's counsel; (2) set a value on those services according to the customary fee and quality of the legal work; and (3) adjust the compensation on the basis of the other *Johnson* factors that may be of significance in the particular case. *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974); *Copper Liquor, Inc. v. Adolph Coors Co.*, 684 F.2d 1087, 1092 (5th Cir. 1982). Steps one and two result in a computation of the "lodestar" amount. Both the hours worked and the hourly rate must be reasonable. *See Hensley v. Eckerhart*, 461 U.S. 424, 433–34 (1983). In the final step, the lodestar is adjusted on the basis of the other factors enumerated in *Johnson*. That is,

---

[11] Dean's affidavit has an apparent mathematical error. Dean states in his affidavit that his billing rate is $300 per hour and that he spent 51.8 hours on the motion. Docket no. 94 at 27–29. His timesheet also reflects 51.8 hours worked. *Id.* at 41. At $300 per hour, 51.8 hours equals $15,540. Yet Dean's affidavit and timesheet both calculate this amount at $16,540.

once the basic fee is calculated, the Court may adjust the amount upward or downward. This adjustment is made by applying the factors identified in *Johnson.* Rarely are all factors applicable, however, and a trial judge may give them different weights. *Id.*

Before turning to the reasonableness of Stevens' attorney's fees in filing the motion to void, the Court first notes that Stevens is not entitled to the $1,206.74 in expenses that it seeks. Billing statements attached to Key's affidavit list a total of $477.11 in "Legal Research - Westlaw" expenses. Docket no. 94 at 10 (listing a $291.11 expense), 13 (listing a $186.00 expense). The billing statements are redacted, however, showing only billable items related to the motion to void while leaving other items blacked out entirely. As a result, the Court has no basis to determine which portion of these legal research expenses can be allocated to the motion to void and which were incurred researching other matters. In addition, the billing statements list a total of $549.63 in travel and meal expenses to attend the January 25 hearing, part of which involved the motion to void. Docket no. 94 at 24. These expenses are not recoverable because the primary subject of this hearing was initially several unrelated discovery issues, and the hearing was set before Stevens filed its motion to void; in other words, aside from his work in preparing the motion to void, Stevens' counsel would have nevertheless incurred these expenses to attend the hearing. As a result, the $1,206.74 in fees that Stevens seeks are not recoverable.

To assess the reasonableness of fees incurred in filing the motion to void, a brief review of the motion itself is necessary. Not including the signature page, the motion is 18 pages. Docket no. 69. It contains a timeline in the form of a chart that spans at least five full pages. *Id.* at 4–9. It cites ten total cases, often for long block quotes that are specially formatted to take up large amounts of space. *See, e.g., id.* at 1 (quoting *Gordon v. Kaleida Health*, 737 F. Supp. 2d 91, 96–97 (W.D.N.Y. 2010)). And at many points, the motion is redundant, restating in multiple

places, for example, Stevens' objections to the August 22 notice that Class Counsel sent. *Id*. at 6, 12.

On its face, this is not a motion that would reasonably take three attorneys 130 hours to complete at a total cost of nearly $40,000. To start, most of the work performed by Dean, Stevens' in-house counsel, was limited to "reviewing," "rewriting," "revising," or "redrafting" the motion to void. Docket no. 94 at 41. Stevens is not entitled to an award of fees based on Dean's work on the motion because most of his work was duplicative of work already done by Stevens' outside counsel.

Stevens outside counsel worked a total of 78 hours. *See* Docket no. 94 at 8–25. Freeman performed 68.75 of these hours at his billable rate of $300 per hour. *See id*. Key performed 9.25 of these hours at a slightly higher billable rate. *See id*. Given the length of the motion, the complexity of the legal issues, and the duplicity of the work performed between Freeman's 68.75 hours and Key's 9.25 hours, the Court finds that it is appropriate to award fees only for Freeman's work. Accordingly, the Court awards Stevens $20,625.00 in attorney's fees as a sanction for Class Counsel's conduct in sending notices to potential opt-ins. As mentioned above, this award will be made payable 15 days after a final resolution of this case.

## CONCLUSION

Plaintiffs' Motion to Decertify (Docket no. 91) is DENIED. Steven's Motion for Attorney's Fees (Docket no. 94) is GRANTED IN PART while Plaintiff's Motion for Reconsideration (Docket no. 98) is GRANTED IN PART AND DENIED IN PART. As a result, Class Counsel shall pay Stevens $20,625.00—an amount equal to the reasonable attorney's fees incurred by Stevens in preparing its motion to void—as a sanction awarded in the Court's

previous sanctions order. This award is payable to Stevens 15 days after a final resolution of this case.

It is so ORDERED.

SIGNED this 27th day of April, 2017.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE